IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GERALD GADDY #K65375, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 18-cv-1735-DWD |
| | ) |
| WEXFORD HEALTH SOURCES, INC., | ) |
| M. SIDDIQUI, and | ) |
| DR. SHAH, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**DUGAN, District Judge:**

In this matter, Plaintiff Gerald Gaddy alleges that Defendants Wexford Health Sources, Inc., M. Siddiqui, and Dr. Shah were deliberately indifferent to his serious medical needs during his incarceration at Menard Correctional Center ("Menard"). Defendants Siddiqui and Shah are doctors at Menard who Plaintiff alleges were deliberately indifferent to his chronic knee and shoulder pain, and to his head injuries which Plaintiff sustained following a fall from his top bunk. Plaintiff also alleges that Defendant Wexford has an unconstitutional policy or practice of not referring inmates to specialists for medical services. As narrowed at threshold review (Doc. 8) and the Court's order dismissing Defendants Lashbrook and Moldenhauer (Doc. 58), Plaintiff proceeds on the following counts:

    Count 1:    Shah and Siddiqui were deliberately indifferent to Plaintiff's chronic pain conditions in violation of the Eighth

1

        Amendment;

Count 2:    Siddiqui was deliberately indifferent to Plaintiff's head injury on May 2, 2018 in violation of the Eighth Amendment;

Count 3:    Wexford has an unconstitutional policy or practice of refusing to refer inmates out for needed medical services in violation of the Eighth Amendment.

Now before the Court is the motion for summary judgment filed by Defendants (Doc. 68) and memorandum in support (Doc. 69). Defendants Siddiqui and Shah move for summary judgment, arguing that they were not deliberately indifferent to Plaintiff's medical needs because both defendants provided appropriate treatment to Plaintiff and did not disregard an excessive risk to Plaintiff's health. Defendant Wexford also moves for summary judgment by denying that there is a policy or procedure in place that precluded Plaintiff from receiving appropriate medical care. Plaintiff responded to the motion (Doc. 76) and filed a supplement (Doc. 80) to which Defendants replied (Doc. 81). As further detailed below, the Court will grant summary judgment in favor of Defendants.

## Background

Defendants attached over 200 pages of Plaintiff's medical records to their memorandum in support of their motion for summary judgment (Doc. 69-3). Plaintiff does not dispute the accuracy of these medical records, although he alleges that he had additional conversations with his medical providers which were not contained in his medical records. As further detailed in Plaintiff's medical records, Plaintiff suffers from chronic pain in his left knee and right shoulder (Doc. 69-3, p. 19). Defendants do not

dispute that Plaintiff has ongoing knee and shoulder pain, or that he suffered a fall in May 2018. In relation to these injuries, Plaintiff was seen by Dr. Shah on one occasion: December 27, 2017 (Doc. 63-1, ¶ 9), and Plaintiff was seen by Dr. Siddiqui on two occasions: May 9, 2018 and May 30, 2018 (Doc. 69-2, ¶ 4).

Plaintiff was first evaluated for his pain in his left knee and right shoulder at Menard by a nonparty nurse on October 29, 2017 (Doc. 69-3, p. 19). At this evaluation, Plaintiff had a normal range of motion, was ambulatory, and the nurse observed no injury, bruising or swelling to his knee or shoulder (*Id.*). The nurse advised Plaintiff to try stretching and exercises, and to warm his joints (Doc. 69-3, pp. 19-20). Thereafter, Plaintiff was seen regularly by various nonparty nurses and medical providers for his knee and shoulder pain. Further, from October 2017 through at least May 2019, Plaintiff was prescribed various medications for his shoulder and knee pain, including Naproxen Sodom, Motrin, Tylenol, Ibuprofen, and muscle rub (Doc. 69-3, pp. 21-32).

On November 1, 2017, Plaintiff was advised to apply warm, moist heat to his joints as needed, and to apply muscle rub to his knee and shoulder (Doc. 69-3, p. 165). On December 13, 2017, nonparty Nurse Practitioner Zimmer ordered Plaintiff's left knee to be x-rayed (Doc. 69-3, p. 37). The x-ray showed "mild tricompartment osteoarthritis . . . without any acute bony fracture or dislocation." (Doc. 69-3, p. 37). On December 27, 2017, Dr. Shah evaluated Plaintiff (Doc. 69-3, p. 170). His notes are largely illegible, but in his Affidavit, Dr. Shah indicates that he observed no swelling, normal movement, and normal motion in Plaintiff's knee, and some swelling, a lipoma, and normal movement in his shoulder (Doc. 69-2, ¶ 9). Dr. Shah advised Plaintiff to exercise (*Id.*; Doc. 76, p. 6)

3

On March 15, 2018, Plaintiff was evaluated by nonparty Nurse Oakley who observed slight swelling in Plaintiff's shoulder and a slight limp (Doc. 69-3, p. 172). Plaintiff was referred to a nurse practitioner for his continuing pain (*Id.*). Plaintiff was seen on March 21, 2018 by Nurse Practitioner Moldenhauer, who indicated that Plaintiff had a good range of motion and strength, and had Motrin available to him (Doc. 69-3, p. 173).

On May 8, 2018, Plaintiff slipped and fell while trying to get to his top bunk (Doc. 69-3, p. 139). Nonparty Nurse McClure evaluated Plaintiff following his fall on May 8, 2018 (Doc. 69-3, p. 140). McClure observed that Plaintiff had no injuries or bruises but had pain in his back and shoulders (*Id.*). Plaintiff was given pain medications, received x-rays, and placed in observation (*Id.*). While in observation, Nurse McClure noted that Plaintiff had normal range of motion and no injury, swelling, or bruising, but severe discomfort (Doc. 69-3, p. 176). Plaintiff was later observed sitting and laughing, and Plaintiff expressed that he felt a lot better (Doc. 69-3, p. 177). Dr. Siddiqui saw Plaintiff on May 9, 2018, and observed that Plaintiff had generalized pain, but no bruising and was ambulatory (Doc. 69-2, ¶ 14; Doc. 69-3, pp. 52, 178). Dr. Siddiqui reviewed Nurse McClure's reports and Plaintiff's x-rays (Doc. 69-3, pp. 140, 178). Dr. Siddiqui observed no fractures, and permitted Plaintiff to return to his cell (*Id.*) Dr. Siddiqui further ordered a low bunk permit for Plaintiff (Doc. 69-3, pp. 52, 178). Plaintiff's current prescription orders were also continued (Doc. 69-3, p. 179).

On May 10, 2018, Dr. Siddiqui ordered an x-ray of Plaintiff's shoulders and spine (Doc. 69-3, p. 59). The x-rays showed "advanced osteoarthritis of the right glenohumeral

4

joint with bony spurring and remodeling of the humeral head" in the right shoulder and showed "mild osteoarthritis . . . without any acute bony fracture or dislocation" in the left shoulder (*Id.*). The x-ray report suggested that a follow-up study of Plaintiff's right shoulder be completed (*Id.*). On May 11, 2018, Plaintiff was seen by Nurse Practitioner Moldenhauer, who indicated that Plaintiff was ambulatory and had a steady gait (Doc. 69-3, p. 180). Nurse Practitioner Moldenhauer prescribed or renewed Plaintiff's pain medication (*Id.*) Plaintiff was seen again by a nonparty nurse on May 15, 2018, where he was instructed to continue his pain medication (Doc. 69-3, p. 181), and again on May 24, 2018, where he was given Ibuprofen, and instructed to see his provider if his symptoms worsened (Doc. 69-3, p. 182).

On May 30, 2018, Dr. Siddiqui saw Plaintiff for his shoulder and knee pain (Doc. 69-2, ¶ 16). Dr. Siddiqui performed a neurological exam and prescribed muscle rub, Tylenol, and Ibuprofen (Doc. 69-2, ¶ 16; Doc. 69-3, pp. 54, 183). Dr. Siddiqui further referred Plaintiff to physical therapy and to an optometrist for his headaches (Doc. 69-3, pp. 56, 183). Plaintiff was diagnosed with myopia on June 5, 2018 (Doc. 69-3, pp. 56, 123) and received eyeglasses on July 26, 2018 (Doc. 69-3, p. 71). Plaintiff received a physical therapy evaluation on September 6, 2018, and the physical therapist reported that Plaintiff had no injury in his right shoulder or left knee, and good range of motion, but that Plaintiff would benefit from physical therapy, which he was to receive 2x/week for 6 weeks (Doc. 69-3, p. 58). Plaintiff continued to express pain during physical therapy on September 12, 2018, September 19, 2018, and September 20, 2018 (Doc. 69-3, p. 187).

Plaintiff was then transferred to Henry Hill Correctional Center on October 4, 2018 (Doc. 69-3, p. 188). On his Transfer Summary intake form, Plaintiff's pain medication and muscle rub were identified, along with notes for his current physical therapy treatment and glasses (Doc. 69-3, p. 188). Plaintiff was evaluated by a nonparty nurse at Henry Hill Correctional Center on November 1, 2018, who indicated that Plaintiff had a history of knee and shoulder pain, which was exaggerated by his injury in May 2018 (Doc. 59-3, p. 64).

## **Legal Standards**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is "proper only if the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact such that [Defendants are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wragg v. Village of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Defendants bear the initial burden of demonstrating a lack of genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The Court considers the facts in a light most favorable to the non-movant, here Plaintiff. *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009).

The Eighth Amendment prohibits cruel and unusual punishments, and the deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). A prisoner is entitled to

6

"reasonable measures to meet a substantial risk of serious harm"—not to demand specific care or the best care possible. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

To succeed on his deliberate indifference claims, Plaintiff must establish that he has an "objectively serious medical condition" and that a prison official was subjectively aware of the condition and either "knowingly or recklessly disregarded it." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008); *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005). A prisoner may also "establish deliberate indifference by demonstrating that the treatment he received was 'blatantly' inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (internal citations omitted). "Making that showing is not easy: 'A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Id.* "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*; *in accord Snipes*, 95 F.3d at 592 (Generally, a prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim).

Plaintiff must first establish that he has an "objectively serious medical condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). A medical condition is objectively serious "if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir.2014). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and

7

wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); *accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "'deliberate indifference' to a substantial risk of serious harm").

Then, Plaintiff must that a prison official has subjective knowledge of his medical condition—and then disregards—an excessive risk to inmate health. *Snyder*, 546 F.3d at 522. Plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Id.* at 524. "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles*, 771 F.3d at 409. Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* However, "where evidence exists that the defendant knew better than to make the medical decision that he did, then summary judgment is improper" *Id.* (internal brackets omitted); *see also Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (A medical professional's choice of an "easier, less efficacious treatment" can rise to the level of

8

violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway).

## Analysis

The parties do not dispute that Plaintiff's chronic knee and shoulder pain, along with his head pain following his fall in May 2018, were objectively serious medical conditions. Regardless, a reasonably jury could conclude that these medical conditions were objectively serious. Plaintiff complained of pain over a long period of time and medical professionals documented osteoarthritis in both his shoulder and knee after x-rays were completed. Plaintiff was prescribed pain medication, muscle rub, and physical therapy during the course of treatment for his knee and shoulder issues. He was further prescribed pain medication, held under medical observation, and later prescribed eyeglasses for his headaches following his fall in May 2018. As such, the record supports finding that a reasonable jury could find that Plaintiff can satisfy the first prong of the deliberate indifference test as to all of his deliberate indifference claims.

As for the second prong, Plaintiff does not dispute that he was seen and treated by Defendants in relation to his knee and shoulder pain. Instead, he generally objects to Defendants' course of treatment, and specifically to their alleged failures to provide him with an MRI, knee brace/sleeve, and a low bunk permit (Doc. 76, pp. 26-30). Plaintiff further asserts that he was denied this treatment because Defendant Wexford would find the treatment options to be too costly (*Id.*).

I. **Deliberate Indifference Claims against Dr. Shah**

Dr. Shah had limited interaction with Plaintiff. As discussed above, Plaintiff was seen by Dr. Shah on one occasion, where he reviewed Plaintiff's x-rays taken in December 2018, and ultimately recommended that Plaintiff exercise. Plaintiff's recollection of his appointment with Dr. Shah differs slightly from his medical records. Specifically, Plaintiff asserts that he requested a low bunk permit and knee brace, which Dr. Shah denied (Doc. 76, pp. 2-3). Plaintiff further claims that Dr. Shah prescribed him physical therapy and told him to exercise (*Id.*). Defendants dispute these additional statements and argue the statements are not substantiated by Plaintiff's medical records (Doc. 81, ¶ 5). However, these disputed statements are not material to Plaintiff's claim against Dr. Shah. Instead, and regardless of the accuracy of these additional statements, the undisputed facts in the record indicate that Dr. Shah evaluated Plaintiff on one occasion and recommended a course of treatment of exercise based on his professional judgment.

Other than conjecture by Plaintiff, there is no evidence in the record of any delay or dragging out of care, or mistreatment by Dr. Shah. Although Plaintiff disagreed with Dr. Shah's treatment recommendation, instead asserting that he required an MRI, knee brace, and low bunk permit, Plaintiff's disagreement alone does not establish deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."); *see also*, *Snipes v. DeTella*, 95 F.3d 586, 591-92 (7th Cir. 1996). Instead, the record reflects that Dr. Shah pursued a treatment plan based on his professional judgment, and, as a result, he lacks the culpable mental state required for establishing

that he was deliberately indifferent. There is no evidence that he chose an easier or less effective course of treatment without exercising his professional judgment. Because no reasonable juror could conclude otherwise, Defendant Shah is entitled to summary judgment on Plaintiff's deliberate indifference claim.

## II. Deliberate Indifference Claims against Dr. Siddiqui

Dr. Siddiqui also had limited interaction with Plaintiff. As discussed above, Plaintiff was seen by Dr. Siddiqui on two occasions. First, on May 9, 2018, after Plaintiff fell from his top bunk. The record reflects that Dr. Siddiqui was informed, and reviewed, nonparty Nurse McClure's initial evaluation of Plaintiff after his fall on May 8, 2018. Dr. Siddiqui further reviewed Plaintiff's prescriptions and Nurse McClure's later observations of Plaintiff. Dr. Siddiqui then personally examined Plaintiff on May 9, 2018 and reviewed his x-rays, and when he observed no bruising or fractures cleared Plaintiff to return to his cell. He further ordered a low bunk permit for Plaintiff. Dr. Siddiqui saw Plaintiff again on May 30, 2018 for Plaintiff's ongoing shoulder and knee pain. Dr. Siddiqui performed a neurological exam, and prescribed muscle rub, Tylenol, Ibuprofen, and physical therapy. Dr. Siddiqui further referred Plaintiff to an optometrist for his headaches.

Again, Plaintiff alleges that he and Dr. Siddiqui had additional conversations about his course of treatment that were not contained in his medical records. Specifically, Plaintiff alleges that he requested an MRI and additional medications for his pain, btu that Dr. Siddiqui denied those requests as they were too expensive (Doc. 76, pp. 3-4).

11

Defendants again dispute these additional statements and argue that they are not substantiated by Plaintiff's medical records (Doc. 81, ¶¶ 25, 27). These disputed statements are also not material to Plaintiff's claims against Dr. Siddiqui. Instead, regardless of their accuracy, the undisputed facts in the record indicate that Dr. Siddiqui evaluated Plaintiff on two occasions and prescribed a course of treatment to address his chronic pain, headaches, and to ensure Plaintiff did not sustain injuries from his fall in May 2018.

The record further reflects that Dr. Siddiqui provided Plaintiff with medical treatment based on his professional judgment. Again, other than conjecture by Plaintiff, there is no evidence in the record of any delay or dragging out of care by Dr. Siddiqui. Although Plaintiff disagreed with some of Dr. Siddiqui's recommendations, he also admitted that some of the recommended treatments (specifically his recommendations for physical therapy and referral to the optometrist) were at least minimally helpful. Plaintiff also does not dispute that Dr. Siddiqui provided him with a low bunk permit, a course of treatment Plaintiff claims to have been previously denied by other medical providers.

Despite Dr. Siddiqui's documented treatment, Plaintiff asserts that Dr. Siddiqui delayed treatment for his physical therapy and was further deliberately indifferent because he failed to prescribe stronger pain medication or offer an MRI. These allegations, however, do not establish deliberate indifference. *See Pyles*, 771 F.3d at 409; *Snipes*, 95 F.3d 591-92. Instead, the record reflects that Dr. Siddiqui pursued a treatment plan based on his professional judgment, and, as a result, he lacks the culpable mental

state required for establishing that he was deliberately indifferent. Further, there is no evidence that he chose an easier or less effective course of treatment without exercising his professional judgment. Because no reasonable juror could conclude otherwise, Defendant Siddiqui is also entitled to summary judgment on Plaintiff's deliberate indifference claim.

### III. Deliberate Indifference Claim Against Wexford Health Sources, Inc.

Plaintiff cannot succeed against Defendant Wexford Health Sources, Inc. without establishing one of the three factors laid out in *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). *Shields v. Ill. Dept. of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014) ("For now, this circuit's case law still extends *Monell* from municipalities to private corporations. To recover against Wexford under our current precedent, [Plaintiff] must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a serious of bad acts that together raise the inference of such a policy.").

Liability under *Monell* may be shown in three ways. First, a plaintiff may establish that the unconstitutional action "'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Glisson v. Indiana Dept. of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017) (quoting *Los Angeles County v. Humphries*, 562 U.S. 29, 35 (2010)). Second, a plaintiff might demonstrate liability by establishing a widespread "custom" that has received no formal approval, *see Glisson*, 849 F.3d at 379, but is "so permanent and well settled as to constitute a custom or

13

usage with the force of law" even though they received no formal approval. *Monell*, 436 U.S. at 691 (internal citations omitted). Finally, plaintiff might prove that a custom was created by "'those whose edicts or acts may fairly be said to represent official policy.'" *Glisson*, 849 F.3d at 379 (quoting *Monell*, 436 U.S. at 690-91).

Plaintiff pleaded his case as one alleging a widespread custom of cost-cutting, but the Plaintiff refers to no facts in the record that support or point to the existence of such a custom or policy. A widespread custom may be established by evidence of policymaking officials' knowledge and acquiescence to the unconstitutional practice. *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 511 (7th Cir. 1993). Sufficient evidence may include proof that the practice was so "longstanding or widespread" that it would "support the inference that policymaking officials 'must have known about it but failed to stop it.'" *Id.* With respect to Plaintiff, none of Defendants' requested treatment was denied by Wexford[1]. Indeed, the record supports that Plaintiff received consistent prescriptions for his pain, received x-rays, physical therapy, and other treatment. Beyond Plaintiff's conjecture, there is no developed evidence of a pattern or practice of cost-

---

[1]In his Supplement (Doc.80), Plaintiff attached a memorandum indicating that he filed a grievance requesting an MRI in January 2018 (Doc.80, p. 21). In response, Dr. Siddiqui clarified that when Plaintiff was seen for care on December 6, 2017 and December 27, 2017 his providers ordered what they felt necessary at the time, i.e. x-rays (*Id.*). The allegations at issue in this grievance are not at issue in this matter. Nevertheless, this memorandum does not support Plaintiff's contentions that he was denied treatment from Wexford because of some policy or procedure. Instead, the memorandum indicates that Plaintiff's medical providers did not agree with Plaintiff's requested course of treatment (an MRI), and instead ordered x-rays for Plaintiff. Accordingly, to the extent Plaintiff's request for an MRI was denied, the record does not provide that the course of treatment was denied by Wexford, but instead it was denied because Plaintiff's medical providers prescribed a different course of treatment based on their own professional judgment.

cutting before the Court in the record in this case. Without some degree of proof to create a question of fact, the claim against Wexford based on an official or unofficial policy cannot proceed.

In his responses to Defendants' motion for summary judgment, Plaintiff describes Dr. Siddiqui as the final policymaker available to him at Menard (Doc. 76, p. 15). Even accepting that as true, there is insufficient evidence to support a *Monell* claim on that basis. First, as described above, the Court concluded that the care by Dr. Siddiqui did not amount to a constitutional violation. Additionally, the record demonstrates a course of continuous care by Dr. Siddiqui and the medical staff at Menard that does not support a finding that there was a custom of cost-cutting as to Plaintiff or even of a more widespread custom at Menard. Plaintiff has provided no evidence that any of Defendants' requests for treatment were denied by Wexford. Further, Plaintiff received pain medication, monitoring, treatment for his pain, and physical therapy. There is no showing of a pattern or practice of avoiding care of his medical conditions, and there is no evidence of a more widespread custom, policy, or practice by the medical staff at Menard. Plaintiff merely argues that Dr. Siddiqui was the final policymaker without pointing to additional details of a constitutional violation beyond those discussed above. As such, Plaintiff's claim against Wexford cannot proceed.

## Conclusion

For the above-stated reasons, Defendants Shah, Siddiqui, and Wexford's motion for summary judgment (Doc. 68) is **GRANTED**. The Clerk shall enter judgment in favor

of Defendants Shah, Siddiqui, and Wexford Health Sources, Inc., and against Plaintiff Gerald Gaddy.

**SO ORDERED.**

Dated: March 25, 2021

_____
DAVID W. DUGAN
United States District Judge